Filed 4/27/22  In re Christopher W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Christopher W. et al., Persons Coming Under the Juvenile Court Law. | D079658 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, et al.<br><br>    Respondents,<br><br>        v.<br><br>Christopher W. et al.<br><br>    Appellants. | (Super. Ct. Nos. J520814A-B) |

APPEAL from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Reversed and remanded with directions.

Linda Rehm, under appointment by the Court of Appeal, for Appellants (Minors).

Richard L. Knight, under appointment by the Court of Appeal, for Respondent Christopher W. (Father).

Shobita Misra, under appointment by the Court of Appeal, for Respondent S.S. (Mother).

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel for Respondent San Diego County Health and Human Services Agency (Agency).

Minors Christopher W. and C.W. appeal from juvenile court orders dismissing dependency petitions filed on their behalf under Welfare and Institutions Code section 300, subdivisions (a) and (j).[1] The petitions alleged their father, Christopher W. (Father), caused Christopher serious physical harm by engaging in excessive discipline, consisting of repeated belt strikes that resulted in bruising to multiple body parts. The petitions further alleged the boys' mother, S.S. (Mother), failed to protect Christopher, the family had a history of physical abuse, and C.W. was also at substantial risk of abuse. The minors contend the court erred by not taking jurisdiction. We agree, and conclude the undisputed evidence compelled the juvenile court to find they were subject to jurisdiction. We reverse and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Events Leading to Dependency Petitions*

Christopher is 12 years old, and C.W. is 10 years old. Mother and Father are married, but separated in 2017 due to domestic violence. She obtained a restraining order and lived with the boys and maternal grandmother in Elk Grove, in Sacramento County. By 2021, Mother had trouble controlling the boys, and contacted Father. He started visiting, and

---

1   Further statutory references are to the Welfare and Institutions Code unless noted. Although the Agency did not appeal, it filed a letter brief joining the minors' position. (Cal. Rules of Court, rules 8.200(a)(5) ["party may join in . . . a brief in the same . . . appeal"]; 8.412(a)(1) [rule 8.200 governs briefs that may be filed in juvenile appeals].) We refer to points by the minors or Agency as being by the minors, and points by Father or Mother as being by the parents, and distinguish as warranted.

moved with the boys to San Diego in March or April 2021. Mother joined them in June or July 2021.

On July 22, 2021, the Agency received a report of physical abuse. The reporting party heard a "loud smacking sound, over and over, with the child crying louder in what appears to be in pain." The reporting party had also "overheard the children crying and screaming, daily." Social workers Helen Biru and Erika Bruno went to the home. Mother said Christopher had stolen "$1,000 dollars' worth of electronics from their room," Father "lost his temper," and "spanked [him] about five times" with the belt, and she "had to take [Father] outside to cool off."

The parents declined an interview of Christopher, but let Biru to do a body check. She saw "significant bruises that Christopher disclosed were from a belt." There were marks on his "left arm, leg, back, lower left stomach and left thigh," some consistent with a belt. Some bruises were "fresh in color," while others "appeared old . . . ." Biru did speak with C.W., who reported Father gave the boys a "whooping" with the belt for "something really serious" and hits them "on the legs, back, and hands," but denied he gets bruises. C.W. said he last got one "a couple weeks ago," while Christopher got one "today, yesterday, yesterday, and yesterday." C.W. also said Mother "beat Christopher with a pole one time when they lived in Elk Grove because he broke his bed."

Biru also spoke with Mother, who described the boys' discipline issues, such as Christopher taking her keys and the boys' theft of marijuana edibles from her car. She said Christopher was "last 'whooped' six days ago 'and that's why he has some old marks.' " She explained he "tries to get away" from Father and "hurts himself in the process," and she did not blame Father. At one point, Mother had her aunt in Elk Grove on the phone, and

3

said she would take the child there, which the Agency viewed as a "flight risk." Biru asked if the aunt would come to San Diego to be part of a safety plan, and Mother said she was unable to. Biru then asked if other family members were available, reiterating the need to safety plan, and Mother asked her to leave.

That evening, social workers Bruno and Christopher Hines returned with police officers. Hines told the parents they had protective custody warrants, because of Christopher's bruises and their "unwillingness to agree to a safety plan. . . . " Father said he did not think it was "appropriate to not be able to physically discipline his son . . . ." Mother also maintained Father was "allowed to discipline" Christopher, and that although they "used a belt . . . in the past," it was "not to the extent to leave marks or bruises." She also said Christopher "bruises like a tomato," and it was more appropriate to have him assessed in two days "when the injuries don't look as bad." When asked what she wanted to happen, Mother said she "wants to protect herself due to her son's 'criminalistic[ ] behavior.' " According to the police notes, Christopher stated he was disciplined recently for stealing, but bruises on his arm were from skateboarding, and Father admitted to hitting him and locking him in a closet two weeks earlier.

The next day, Dr. Premi Suresh, a Rady's Children's Hospital child abuse expert, provided a consultation for Christopher based on a photograph. She opined the bruising was "consistent with being struck with a belt," and that "[b]eing struck with a belt leaving bruising is physical abuse." Christopher told Hines that Father hit him with the belt "about '50 times,' " while C.W. said Father hit Christopher "28 times."

4

B. *Dependency Petitions and Detention*

On July 26, 2021, the Agency filed petitions under section 300, subdivision (a) (for Christopher) and (j) (for C.W.) Christopher's petition alleged Father subjected him to serious physical harm due to excessive discipline, citing "extensive bruising to his arm, leg, back and stomach, which . . . were caused by the Father striking [him] repeatedly with a belt." It stated Mother "blames [Christopher's] 'criminalistic' behavior for the beatings and has failed to protect" him. The petition further alleged the boys "describe[d] frequent 'whoopings' in the home as a form of discipline"; the family had an "extensive prior child welfare history of domestic and physical abuse"; and the parents "declined efforts to safety plan." C.W.'s petition alleged he was at substantial risk of abuse for the same reasons.

The Agency's detention report addressed the events of July 22, as well as the family's child welfare history and input from neighbors.

The child welfare history included multiple allegations of abuse or neglect. None were substantiated, but certain underlying events are pertinent. In March 2017, there was a domestic violence incident, in which Father hit Mother in the upper body with a chair multiple times and she had a contusion on her cheek. A November 2017 referral indicated Mother "walked in on [Father] hitting Christopher on the stomach" earlier that year, and she intervened and told him to leave. In May 2021, there was a domestic violence incident, in which Mother broke three fingernails, causing bleeding; she hit Father with a wine bottle; and they later began arguing again, leading to a police call and Father's arrest.[2]

---

[2]    As of the detention report, a referral involving the May 2021 incident remained open. The Agency seeks judicial notice of petitions filed in March 2022 based on domestic violence, and related orders, which Father opposes. These events are not relevant to this appeal, but we take notice of their

5

Three neighbors provided input. All three heard screaming or crying sounds on July 22. One neighbor recalled a "smack and a scream" the previous Saturday. Another reported an incident on July 8, when she heard spanking sounds, and banged on the floor or wall for Father to stop. The third neighbor said multiple people reported hearing "smacking and screaming" at various times of day.

At the detention hearing, Father's counsel disputed the parents did not agree to a safety plan, stating they were "more than willing" to do one. The court noted there was "at least some discussion as to a safety plan." The boys were detained with their paternal grandparents.

C. *Jurisdiction and Disposition*

In August 2021, social worker Vanessa Chavez filed the Agency's jurisdiction and disposition report, which recommended the boys be declared dependents and removed from custody. The report provided further input on the parents, and their use of discipline.

Mother worked as a paralegal, and was enrolled in law school. She addressed the boys' misconduct, noting they have "stolen from neighbors" and "pick locks." She said that for discipline, they use "time out" and have the boys "stand in a corner," they have taken away their electronics, and she had taken them to therapy. She said "she is not one to hit her children[,] but 'after time, after time, after time, they will get their butts whooped.' " As for the July 22 incident, Mother stated that "once she saw [Father] hitting

_____

existence, as our disposition requires the juvenile court to consider the family's current circumstances.

6

[Christopher] she stopped him." She said "it was not right but she did not know how to deal with [Christopher] anymore."[3]

Father was employed with the State Franchise Tax Board. He said Christopher "steals and lies," and they are "trying to keep him from going to juvenile hall." He said the boys "don't get whooped all the time," he "only uses this form of discipline when their behaviors are extreme," and they mostly use "time out" and take the boys' electronics. As for the July 22 incident, he "agree[d] he went overboard this time," and "now knows to use his hand."

The neighbor who reported pounding on the floor or wall for Father to stop, around June 8, described another incident a week later (i.e., July 15 or 16). She said Mother told her to call the police, which she did, but the police said they "were allowed to discipline their kids." She said the abuse then escalated, and she would "hear it almost every day."

The Agency concluded the boys were at serious risk of abuse, as Father had used excessive discipline on Christopher, the parents lacked necessary insight to maintain a safe environment, and Mother had not shown she could keep the boys safe. At the initial jurisdiction and disposition hearing, the parents set the matter for a contested hearing.

Addendum reports discussed the family's progress in September and October 2021. Father was enrolled in a parenting class, and finished intake for a child abuse class. Mother completed intake for a parenting class, and the Agency was looking for a child abuse class that fit her schedule. After a child and family team meeting in September, a social work supervisor called

---

[3]     Mother also reported she might have Cheyenne heritage, and her father might know more. On remand, compliance with the Indian Child Welfare Act should proceed as applicable.

7

the parents to discuss placing the boys with them. The parents "acknowledged that this incident crossed the line." They agreed to engage in parenting and child abuse education, to utilize in-home therapeutic behavioral services for the children, and to not use physical discipline. The Agency changed its recommendation to family maintenance services, and noted the boys said they wanted to live with their parents and felt safe with them.

At the pretrial conference in October 2021, the court ordered the boys detained with the parents, subject to the Agency's conditions.

D. *Contested Jurisdiction and Disposition Hearing*

The jurisdiction and disposition hearing was held two weeks later. The juvenile court admitted the Agency reports into evidence, as well as the police notes and two character letters, and heard testimony from social worker Chavez and the parents.

Chavez testified she wanted the boys in wraparound services, where they would receive therapy to address their behaviors and psychological evaluations if needed, but that wraparound services were only available if the case was open. She acknowledged Mother had them in therapy before, and intended to continue. With respect to Mother's own therapy, Chavez wanted her to address "how to deal with the children's behaviors" and domestic violence. She said the parents could also address child abuse issues in therapy, rather than a class. As for parenting classes, Chavez said Mother was set to start; she was unaware Father had completed a parenting class. She agreed the parents were primarily interested in the boys' welfare.

Mother testified the boys' behavior had escalated before she reached out to Father, including stealing knives and splashing motor oil on the house. C.W. was also going into a neighbor's patio, and she worried he could be shot.

8

She had the boys in therapy and psychiatry, and tried different things at home, like door alarms that they learned to circumvent. She used physical discipline for "something . . . extreme," usually an "open hand." When asked if she used a belt or other implement, she said, "Not . . . in recent years, maybe when they were younger," noting Christopher was "about as big" as her. Mother reconnected with Father because he was "[t]he kind of person" the boys needed and "more consistent" than her. She last saw him hit Christopher with a belt "maybe five years ago." When asked if she thought the July 22 incident was appropriate discipline, she said "at the time, and given the circumstances, yes," noting Christopher's actions had become brazen and there was an "escalation in discipline." She stated, "So, I did think a spanking was appropriate. The situation, as it played out, was not at all what I thought it was going to be." Mother further testified she was making progress in therapy.

Father testified the July 22 incident followed three or four days of Christopher taking laptops and other electronics from Father's drawers. On the first day, he had him stand in a corner for a "time out,"; on the second, he limited his television viewing; and, on the third, he gave him a lecture. Father then used the belt "no more than four times" before Mother stopped him, and upon seeing the bruises, his impression was that "it was a little too much." He said he did not intend to bruise him, and the bruises resulted because Christopher is "very fair-skinned," and was "doing cartwheels and backflips." He also said he had not used the belt since the boys were back, and the belt never bruised Christopher before. Father explained he received a belt for punishment while growing up, but now knew it was "no longer a reasonable way to discipline a child" and would not use a belt again.

9

When asked how he intended to prevent Christopher's behavior from escalating again, Father said they obtained a lockbox and could find multiple ways to discipline the boys. On cross-examination, County counsel asked for his "plan for discipline in the future." He said he had "different plans already," including time outs; he would "have to find a method for extreme situations"; and he would think "very, very deeply" about how to address behavior "without . . . any physical content." He further testified he completed the parenting class that Mother would be taking. Father noted he received paperwork from the Child Abuse Central Index (CACI), and was concerned about being on the list, because he could lose his employment.

After counsel presented argument, the juvenile court dismissed the petitions. The court found the parents were "pretty much near the top" on credibility. It stated Father "didn't believe there was anything wrong with the belt because that's the way he grew up," and reflected on the judge's upbringing in the South in the 1960's. The court then found Christopher had "no credibility" and was "going to end up in the system if something isn't done," noting the judge had done "juvenile justice on the delinquency side for 12 years."

The juvenile court turned to the July 22 incident, summarized Father's escalating discipline, and stated, "[Christopher] deserved getting whooped. I'm not condoning using a belt for physical punishment, but it is what it is in that regard . . . ." The court quoted from *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 93 (*Gonzales*), which remanded a CACI child abuse report and recognized a right to reasonable discipline:

> " '[T]he reasonableness of a given instance of corporal punishment depends on four factors: the age of the child, the part of the body that was struck, the instrument used to strike the child and the amount of

10

damage inflicted. . . .  [W]e believe that visible bruising demarcates, . . . or at least very nearly approaches the outer limit of the quantum of 'damage' to be tolerated.  However, we do not believe that it necessarily compels a finding of abuse unless there are grounds to find the parent intended to inflict bruising[,] knew his or her conduct would do so[,] or should have known that bruises were likely to result from the amount of force applied and the method of its application.' "

The juvenile court found there was visible bruising (noting this "demarcates the line"), Father intended to use the belt, and the neighbors were concerned. The court still determined his discipline was reasonable.  It found he had a "genuine disciplinary motive."  It next found there was "[r]easonable occasion to apply discipline," and that "whether . . . [that] warrants a belt, . . . .  Given the circumstances described by the father, I would say yes."  The court then stated the "real issue is whether . . . he did intend to use a belt," and while he did, the court "did not think there was any intent to . . . endanger the child by bruising him," noting "belts are at the . . . line of demarcation."

The juvenile court concluded by finding the family did not need juvenile court protection, but, rather, that Christopher needed his parents' protection from the juvenile justice system, and dismissed the petitions.  The court then advised the parents to seek therapy for themselves and the boys, and told Father that, at the boys' ages, "using your hands is inappropriate, as well." The minors timely appealed.

## DISCUSSION

The minors contend the juvenile court erred by declining jurisdiction, while the parents maintain Father's discipline was reasonable, the boys were not at risk of harm, and Mother was protective.  We conclude the juvenile court was compelled to exercise jurisdiction under the circumstances.

11

## A. *Applicable Law*

Section 300, subdivision (a) provides for dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." The subdivision states that "[f]or purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." (*Ibid*.) Jurisdiction under subdivision (j) requires the juvenile court to find the child's sibling "has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i)," or "there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).) Section 300 further states the section is not intended to "prohibit the use of reasonable methods of parental discipline . . . ."

The Agency "has the burden of proving by a preponderance of the evidence that the children are dependents of the court under section 300." (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Generally, we review the record for substantial evidence to support the juvenile court's section 300 jurisdictional findings. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137 (*Isabella F.*).) In applying the substantial evidence standard of review, we "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996 (*O.B.*).)

However, when the party with the burden of proof has failed to carry it, the question for the reviewing court is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180

12

Cal.App.4th 1517, 1528, disapproved on other grounds in *O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "[4] (*I.W.*, at p. 1528.)

B. *Analysis*

1. *Unreasonable Discipline*

We begin with Christopher. As we shall explain, the undisputed evidence compelled a finding that Father engaged in unreasonable discipline.

"Section 300 preserves the rights of parents to administer 'reasonable and age-appropriate' discipline." (*In re D.M.* (2015) 242 Cal.App.4th 634, 642 (*D.M.*); *id.* at pp. 640-641, citing *Gonzales*, *supra*, 223 Cal.App.4th at p. 86.) "Whether a 'parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of [the] parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.' " (*D.M.*, at p. 641; cf. *Gonzalez*, at p. 91 [describing third element as a "disciplinary measure reasonable in kind and degree"].) "Where parental discipline exceeds these limits, juvenile courts have not hesitated to uphold the assertion of dependency jurisdiction." (*D.M.*, at p. 641.)

---

4    The Agency argues we should use de novo review because the juvenile court erred in applying section 300 (including by focusing on the need for discipline, rather than harm), but also that reversal is warranted under any standard. Given we conclude the undisputed evidence compels reversal, we need not address this argument as to de novo review.

We assume without deciding that Father's conduct was genuinely disciplinary, and discipline was necessary in light of Christopher's behavioral issues. (*D.M.*, *supra*, 242 Cal.App.4th at p. 641.) However, the uncontradicted evidence left no room for the juvenile court to determine that the extent of punishment was reasonable.

The juvenile court found that despite visible bruising and a belt being at the "line of demarcation" (referencing *Gonzales*), it did not "think there was any intent to . . . endanger" Christopher. But the undisputed evidence still established that Father went too far. *Gonzales* itself notes that whether punishment is reasonable turns on factors like the "age of the child"; the "part of the body that was struck"; and the "method of . . . application." (*Gonzales*, *supra*, 223 Cal.App.4th at p. 94.) Christopher is a 12-year old boy, Father struck him on *multiple* body parts, and Father used the belt *multiple* times, with enough force to leave visible bruises. Dr. Suresh opined this kind of conduct amounts to physical abuse.[5] And the parents agreed it "crossed the line," after the September 2021 child and family team meeting (despite trying to justify the bruising, due to Christopher's skin tone and movement while being struck). Father also told the social worker he went "overboard," and testified it "was a little too much." Mother likewise felt it was "not right," and "the "situation . . . was not at all what [she] thought it was going to be."

In sum, the undisputed evidence compelled the juvenile court to find Father engaged in unreasonable discipline, and to take jurisdiction over

---

5      Father criticizes Dr. Suresh's opinion, including by speculating that doctors are incentivized to report child abuse. We decline to engage in conjecture, and note there is no contrary expert opinion in the record.

Christopher. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435 (*J.K.*) ["showing of prior abuse and harm" sufficient for jurisdiction under § 300, subd. (a)].)

The parents' arguments lack merit. First, they contend Father's use of a belt to the point of bruising was not excessive as a matter of law, citing *Gonzalez* and *D.M.* These cases held parents have a right to reasonable discipline, and reversed findings related to child abuse that did not account for that right. (*Gonzalez, supra,* 223 Cal.App.4th at pp. 75, 102 [reversing CACI report based on spanking on buttocks with wooden spoon that caused bruising; reviewing court could not say "use of a wooden spoon to administer a spanking necessarily exceeds the bounds of reasonable parental discipline," and reversing with directions]; *D.M., supra,* 242 Cal.App.4th at pp. 637, 642 [mother used "hand or a sandal to spank" on the buttocks on " 'rare' occasions" and "never hard enough to leave bruises"; juvenile court erred by treating use of implement as dispositive and failed to consider "genuineness, necessity, or reasonableness" of punishment].) Both cases left open the possibility that, on a particular record—like the record here—the undisputed evidence could compel a finding that discipline was unreasonable. Further, Father's conduct was more egregious than the discipline in either *Gonzales* or *D.M.*[6]

Father makes a related point here. Citing *Gonzales*, he argues that unless discipline causes permanent marks or is meant to cause substantial pain, marks alone do not always indicate child abuse. (*Gonzales, supra,* 223 Cal.App.4th at p. 93 [disagreeing "visible bruises" require a finding of

---

[6] The parents also cite a California Attorney General opinion that states it is lawful to spank with an "object other than the hand," if the punishment is necessary and not excessive. (80 Ops.Cal.Atty.Gen. 203.) This opinion is consistent with *Gonzales* and *D.M.*, and also does not support affirmance.

unreasonable discipline, while noting "lasting bruises" may reflect this].) He also draws a distinction between reasonable discipline and "using a belt . . . to leave permanent scarring," citing *Gonzales* and *D.M.* But neither case talks about "scarring," *D.M.* did not involve bruising at all, and, as discussed *ante*, the presence of bruising was not the only evidence Father's discipline was unreasonable. (Compare *Gonzales*, at p. 94, fn. 17 ["All we have said is that where the *only* indication of excessive discipline is visible bruising on a child's buttocks, the fact that the bruising was inadvertent will support a finding" of reasonable discipline, italics added].)

Second, the parents cite other decisions involving parental discipline, but none support a different result.

They first address a set of child abuse cases discussed by *D.M.*, which began by describing cases involving unreasonable discipline. (See *D.M.*, *supra*, 242 Cal.App.4th at pp. 641-642; citing, e.g., *In re Mariah T.* (2008) 159 Cal.App.4th 428, 438-439 [parent hit three-year-old on stomach with belt, causing deep bruises, after minor disobedience]; *In re David H.* (2008) 165 Cal.App.4th 1626, 1629 [parent hit son with belt and electric cord 21 times due to misconduct, causing bruises, welts, and broken skin]; *J.K.*, *supra*, 174 Cal.App.4th at p. 1433 [father dislocated daughter's shoulder].)[7] The *D.M.* court then contrasted these cases with those where discipline was found reasonable. (*D.M.*, at p. 642, citing *In re Joel H.* (1993) 19 Cal.App.4th 1185,

_____

[7]     (See *D.M.*, *supra*, 242 Cal.App.4th at pp. 641-642; also citing *In re A.E.* (2008) 168 Cal.App.4th 1, 3 [young child was disciplined with "hard objects, violently enough to leave black and blue bruises"]; *In re N.M.* (2011) 197 Cal.App.4th 159, 162-163, 169 [parent hit minor with iron pipe on leg and broom on stomach, causing lasting marks, and hitting her hand, causing bleeding]; *In re Cole C.* (2009) 174 Cal.App.4th 900, 916-917 [parent sprayed daughters with water from hose, used ice packs, and pulled hair, and planned harsher discipline for son].)

1202 [caregivers spanked child on buttocks with open hand, occasionally with his arms held up or shaking him to get his attention; no evidence of harm]; *Isabella F.*, *supra*, 226 Cal.App.4th at p. 134 [isolated incident in which mother struggled with daughter while trying to spank her on buttocks, and unintentionally scratched her face and earlobe].)

The parents contend Father's conduct is distinguishable from the unreasonable discipline cases, because they involved "significant pain or . . . damage[ ]" or a lack of reasonable connection to the child's age or conduct, and is consistent with reasonable discipline ones. We disagree. Although the situation here may be less extreme than in some cases discussed in *D.M.*, it is a far cry from the open-handed, buttocks spanking in *Joel H.* and the apparently accidental scratching in *Isabella F.* (See § 300, subd. (a) ["serious physical harm" does not include reasonable, age-appropriate spanking to buttocks, absent injury].)

The parent cite other cases too, but they are inapposite. *In re Adam D.* (2010) 183 Cal.App.4th 1250 involved only neglect; abuse was not before the reviewing court. (*Id.* at pp. 1254, 1257, 1261 [affirming informal supervision orders based on neglect; noting without analysis that juvenile court struck abuse allegations after finding "only age appropriate spanking"].) Other cases simply confirm parents have authority to oversee the household, and reasonably discipline children, which is not in dispute. (See, e.g., *Vandenberg v. Super. Ct.* (1970) 8 Cal.App.3d 1048, 1055; *Turner v. Turner* (1959) 167 Cal.App.2d 636, 642; *Emery v. Emery* (1955) 45 Cal.2d 421, 429-430.)

### 2. *Risk of Serious Physical Harm*

The undisputed evidence also established both boys were at substantial risk of physical harm as of the jurisdiction hearing, and left no room for the juvenile court to determine otherwise.

17

"The focus of section 300 is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601-602 (*Cole L.*); see § 300.2 [purpose of this chapter is to "provide maximum safety and protection" for children being abused or neglected, or "*at risk of that harm*"], italics added.) "The court may consider past events in deciding whether a child presently needs the court's protection." (*Cole L.*, at p. 602.)

The undisputed evidence showed the parents were long accustomed to physical discipline, including with belts, and there was no plan to avoid further escalation to unreasonable discipline. Father used a belt when the boys were younger, and Mother said she might have. A 2017 referral indicated Father hit Christopher in the stomach. While separated from Father, Mother used physical discipline, mainly with an open hand, but also hit Christopher with a pole at one point for breaking his bed. Once the family reunited, neighbors expressed concerns about hitting and crying noises—concerns the juvenile court acknowledged. Then the July 22 incident happened, just months after the boys began living with Father again. After the incident, the parents told the social workers the boys were "whooped" for extreme behaviors, and initially maintained physical discipline was appropriate. And even after the petitions were dismissed, the juvenile court reminded Father not to use his hand. In addition, the family's history reflected other situations escalating to violence, including the 2017 incident that left Mother with a contusion, and the May 2021 altercation after which Father was arrested.

18

As for avoiding future excessive discipline, Father said he would no longer use a belt, but did not identify any plan beyond that. Instead, he cited "different plans" he already used (like "time outs")—but these had been insufficient. He also stated he would "have to find a method for extreme situations" and would "think very, very deeply" about addressing the boys' behavior without physical discipline—but these were just confirmations that he needed to make a plan. Although social worker Chavez felt the family could address discipline in therapy, it would not be required outside the dependency case, nor would further parenting classes. And wraparound services, which could provide therapy for the boys, would not be available at all.

Viewing the parents' long history of physical discipline, alongside Father's recent use of unreasonable discipline and lack of a plan to avoid it, compels the conclusion that both boys remained at substantial risk of abuse and harm and required the protection of the juvenile court. (§ 300, subd. (a), (j); *Cole L.*, *supra*, 70 Cal.App.5th at p. 602 [court need not wait to protect child, and may consider past events]; *ibid.* [" ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue' "].)[8]

The parents' arguments are not persuasive. First, they contend Father "presented no risk at the time of the hearing," noting the boys were not afraid of them and wanted to be home; they had "ongoing contact with schools,

---

[8] The parents note *D.M.* rejected the claim that courts should be able to take jurisdiction "even when parental discipline is reasonable, because it might later become unreasonable." (*D.M.*, *supra*, 242 Cal.App.4th at pp. 642-643 [ "this reasoning would apply in every case of parental discipline"].) Here, Father's discipline has already become unreasonable.

19

medical providers, and other mandated reporters"; and they "were almost teenagers, [and] would be able to defend themselves."

None of these reasons ameliorate the risk of harm. With respect to the boys' lack of fear, physical discipline was their norm; it did not mean they were safe from excessive discipline, as the July 22 incident illustrated. The presence of mandatory reporters in their lives did not prevent that incident, either. As for their ages, the boys were 12 and 10 years old, not teenagers, and there is no evidence they could defend themselves against Father. The cases cited by the parents involved removal, not jurisdiction, and are otherwise distinguishable. (See *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 284-286, 288-289 [reversing removal of 15-year old from parental custody; parents stipulated to jurisdiction, expressed remorse, and attended parenting classes and therapy, and teenager wanted to go home]; *In re Hailey T.* (2012) 212 Cal.App.4th 139, 147 [juvenile court erred in removing four-year old; unlike infant brother, "who would be unable to articulate . . . abuse," she "had regular contact with teachers and other mandated reporters"].)

Second, the parents dispute they failed to safety plan, and contend they were compliant with services and cared for the boys. These contentions lack merit, too.

The undisputed evidence shows that although safety plan discussions took place, the parents did decline to safety plan, at least until well after the petitions were filed in July 2021. Mother states the social worker "refused" her safety plan of taking Christopher to Elk Grove, but the Agency viewed this offer as a threatened flight risk. When the social worker asked if the aunt could come to San Diego, Mother said no, and when she asked about other family members, Mother told her to leave. As for Father's claim that the parents "agreed to a Safety Plan" in September 2021, he appears to mean

20

their agreement to various conditions with the social work supervisor, so the boys could go home. There is no indication this arrangement was formalized until the pretrial conference in early October—at which point the juvenile court ordered the parents to comply with the conditions.

Neither the parents' participation in services, nor their care for the boys, compels a different result. The issue here is whether the boys remained at risk of harm (§ 300, subds. (a), (j)), and, as discussed above, there was no plan to avoid further excessive discipline. Services like therapy were relevant only insofar as the social worker felt they could help address discipline, but would not be required outside the case (or, for wraparound services, available at all). Likewise, the parents plainly care for the boys' welfare, hence their desire to use discipline to help them behave—but, again, there is no evidence that discipline will remain reasonable.

Finally, the parents note the juvenile court found them credible, but not Christopher. These credibility determinations do not impact our analysis. The only potentially relevant input from the boys that was inconsistent with the parents' statements was the frequency and amount of "whoopings." Setting the boys' input aside, the key facts still remain uncontroverted: Father went too far on July 22; the parents were used to using physical discipline, including with belts; and they had no plan to limit further excessive discipline.

In sum, the undisputed evidence compelled the court to exercise jurisdiction over both minors, and requires reversal of the dismissal orders.

### 3. *Jurisdictional Findings as to Mother*

Mother also disputes the dependency allegations as to her, including that she failed to protect Christopher. We reject these arguments as well.

21

As a preliminary matter, these arguments do not impact our conclusion on jurisdiction. A "minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; see *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 [appellate court "may decline to address the evidentiary support for any remaining jurisdictional findings"].) However, we recognize jurisdictional findings can impact later dependency proceedings. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) We therefore address Mother's concerns, and conclude they lack merit.

First, Mother contends there was no allegation or evidence she inflicted serious physical harm on the boys, and the juvenile court impliedly found her prior use of physical discipline did not amount to excessive punishment. Mother is correct that the dependency petitions did not specifically allege prior serious physical harm or excessive punishment by her. We therefore decline to speculate the court made findings on the issue, and need not address the evidence in this regard.

Second, Mother argues the juvenile court impliedly found she was "protective of the children, and that they were safe in her care," and the evidence reflects as much. To the extent the court made these findings, the undisputed evidence leads to the contrary conclusion.

The record reflects Mother agreed Father's use of the belt on July 22 was appropriate at first, and stopped him only after he repeatedly struck Christopher and bruised multiple parts of his body. Further, as discussed above, the family had a long history with both physical discipline and other violent events, including the recent incident in May 2021 after which Father was arrested. Mother was indisputably aware Father could use excess force, yet brought him back into the boys' lives to help discipline them—leading to

22

the July 22 incident, mere months after they began living with him again, and putting them at risk of further excessive discipline and harm.

Mother maintains that spanking may be appropriate and, even if she approved of Father's discipline, she "properly gauged spanking was warranted," noting Christopher was "about as big as her" and engaged in "escalating, unrepentant behavior." We already determined the amount of punishment used by Father was excessive, and this explanation echoes Mother's concerning input to the social worker that Christopher was to blame. Neither a child's size, nor behavior, justify excessive discipline.

Mother then argues she was in fact protective of Christopher, noting "she successfully stopped Father" and could not have anticipated his actions in advance. She further argues she had been protective of the boys in the past, including separating from Father. Although Mother's prior efforts to protect the family are commendable, we disagree the family's history shows she is protective of the boys now or that she could not have anticipated Christopher could be seriously hurt. For the reasons discussed *ante*, the family's history compels the opposite conclusion.

Finally, the cases cited by Mother involve situations where no children were harmed or placed at risk of harm, and are thus distinguishable. (See *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 117, 119-120 [reversing findings that mother failed to protect children, after isolated domestic violence incident with father while separated from him; minors were not harmed, and evidence did not show she would "nonaccidentally expose [them] to father's violent conduct"]; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [reversing jurisdictional findings based on domestic violence, where, inter alia, "none of

23

the children showed any signs of physical abuse," and incidents occurred years before].)[9]

DISPOSITION

The juvenile court's orders dismissing the petitions are reversed. The matter is remanded to the juvenile court with directions to vacate the orders, to issue new orders sustaining the petitions, and to conduct further proceedings during which it considers the family's current circumstances.

O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.

---

[9] Because we reverse, we need not reach the minors' and Agency's additional assertions of error, including that the juvenile court allegedly relied on personal experience without advance notice to the parties.